HOSKINS v. MATTHES.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

No. 742.

PATENTS—INVENTION—ARTIFICIAL BILLIARD-CHALK.

The Hoskins and Spinks patent, No. 578,514, for an artificial billiard-chalk, which claims as the only patentable feature of such chalk the employment as a base of pulverized silica in its natural or commercial state, is void for lack of invention, in view of the prior art.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The action in the Circuit Court was to restrain the infringement of Letters Patent No. 578,514, issued to William Hoskins and William A. Spinks, March 9, 1897, for a substitute for billiard-chalk. The material portion of the patent, together with the claims sued upon, is as follows:

"Our invention relates to an improved substitute for billiard-chalk. Heretofore it has been the universal practice, so far as we know, to apply to the tip-leather of a billiard-cue chalk or carbonate of lime for the purpose of preventing the tip from slipping off the ivory ball when impact is produced. The chalk is usually formed into cubes and applied by a gentle grinding upon the surface of the tip, the characteristics of the material being such as to cause it to adhere more or less temporarily to the leather, and by reason of being slightly harder than the ivory and considerably harder and more abrasive than the leather surface to grip or bind upon the ivory under impact. We have found that superior results in many respects are obtained where, instead of chalk or other form of carbonate, pulverulent and compacted silica or an equivalent therefor is employed. While many silicates having a frictional property and capable of being pulverized and compacted are capable of use in carrying out our invention and are included therein, whether used alone or in combination with other substances or even in association with carbonates, we prefer to employ a commercially-pure silica associated only with a small percentage of binding material, such as glue, and in some instances associated with a small percentage of corundum or other gritty material, an example of which is found in emery-powder.

"Our invention, broadly stated, therefore consists in a substitute for billiard-chalk comprising compacted pulverulent silica or an equivalent therefor having frictional property and compacted in the form adapting it for application to the tip of a billiard-cue in the same manner that chalk is applied. The silica or its equivalent may be otherwise than powdered preliminary to forming it into a cake or block, but it is essential that the silica or its equivalent employed shall be one capable of ready reduction to a powder after being formed into a cake or block.

"Our invention further consists in a substitute for billiard-chalk in the form of a composition of a pulverulent silica or an equivalent therefor having frictional property, together with a small percentage of binding substances, such as glue, the mass being compacted into a cake or block.

"Our invention further consists in a composition affording a substitute for billiard-chalk composed of pulverulent silica or an equivalent therefor with a binding material, such as glue, and a roughening material, such as corundum.

"Our invention consists, further, of a composition affording a substitute for billiard-chalk composed of pulverulent silica or an equivalent therefor, a coloring substance, such as chrome-green, with or without corundum, and with a binding material, such as glue.

"Our invention consists, finally, in a substitute for billiard-chalk comprising compacted pulverulent silica or its equivalent with a binding material in the form of a cake or block.

"To carry out our invention, we prefer to employ commercially-pure silica, which can be easily obtained in large quantities and in a pulverulent or readily-pulverized form. While the purity of the substance necessarily varies, it will ordinarily approximate from eighty to eighty-five per cent. of pure silica, although a greater percentage of impurities will not render the substance much less useful for our purpose. The silica thus obtained is sifted and ground to a fine powder, mixed with a small percentage of liquid glue and a small percentage of corundum, (emery-powder being usually the most available form,) and a small percentage of coloring agent, chrome-green being more commonly selected, although this may be changed or omitted according to the election of the manufacturer, and the mass, thoroughly stirred, is thereupon placed in molds and firmly compacted. When dry it is at once ready for use. It is found that the substitute for billiard-chalk thus produced has superior advantages over the carbonate of lime or magnesia. It adheres

more tenaciously to the leather of a tip, so that when freed, as the necessary result of impact upon the ball, a very much smaller percentage of the dry coating leaves the cue-tip, and, on the other hand, owing perhaps to the peculiar nature of the silica or its equivalent in this connection, it seems to attack the ivory of the ball with greater firmness with the result that the ball may be struck much nearer to the side without danger of the cue slipping than is the case with the chalk for which this affords a substitute. It is possible, as with the case of ordinary chalk, so to color the substitute that no mark will be left upon the cloth as it falls from the cue-tip, but we prefer to give to the substitute a color which may render its presence on the cloth of the table to be readily observed, as it may thus be more readily removed.

"The percentage of binding material where, as preferred, it is used is dependent upon the amount of hardness which it is desired that the substitute for chalk shall possess. For obvious reasons we deem it more desirable to employ as little binding material as possible. The corundum, when used, is employed solely for the purpose of roughening the tip of the billiard-cue and may be dispensed with when the leather employed is such as to make roughening unnecessary or where roughening is for other reasons not desired.

"What we claim as new, and desire to secure by Letters Patent, is—

"1. A substitute for billiard-chalk composed of pulverized silica or its equivalent, and a binding agent compacted into blocks or cakes, substantially as described.

"2. A substitute for billiard-chalk composed of normally white pulverized silica, a binding agent and a coloring agent, compacted into blocks or cakes, substantially as described."

The following is an analysis of appellant's chalk, as made on behalf of appellant:

|  |  | B 1. Deft. |
|---|---|---|
| Silica | ⎫ | trace |
| Ferric Oxide | | .33 |
| Alumina | ⎬1 | 1.87 |
| Carbonate of lime | | trace |
| Carbonate of magnesia | ⎭ | trace |
| Silica (combined) | ⎫ | 8.10 |
| Silica (uncombined) | | 81.50 |
| Ferric Oxide Fe$_2$O$_3$ | | trace |
| Alumina—Al$_2$O$_3$ | | 2.57 |
| Lime—CaO | | trace |
| Magnesia—MgO | | trace |
| Potash—K$_2$O | ⎬2 | 1.70 |
| Soda—Na$_2$O | | |
| Sulphate of Barium—BaSO$_4$ | | |
| Loss at 100° C | | .40 |
| Loss on ignition | | 2.50 |
| Less loss at 100° C | | |
| Lead Chromate | | none |
| Prussian Blue | ⎭ | none |

1. Soluble in Hydrochloric acid.
2. Insoluble in Hydrochloric acid.
B 1. Blue chalk colored with Ultramarine (Hammer).
C. Spinks chalk.

The defense was non-infringement, and that the patent sued upon was invalid.

Among the patents introduced for the defense were Letters Patent No. 315,828, issued April 14, 1885, to A. Peple for a substitute for billiard-cue chalk, the material portion of which is as follows:

"Billiard-cue tips are covered with chalk-dust to prevent them slipping upon the ball when struck upon the same. The chalk comes off the tip and discolors the cloth of the table and the cushions, and such cloth is unnecessarily

worn by brushing the same in the efforts that are made to keep such cloth clean and free from the marks of the chalk.

"My invention relates to a substitute for billiard-cue chalk, consisting of a pigment of a fine granular or silicious character of the color, or nearly so, of the billiard-cloth, so that the same may be used on the billiard-cues for all the purposes of chalk, and so that the cloth will not be marred in its appearance by the small particles that will inevitably fall or rub off the balls upon such cloth; hence the cloth will not require to be brushed so often or so severely in cleaning the same, and it will not be worn out so rapidly; and, for convenience, I compress such pigment into blocks and varnish the surfaces or cover, all but one side, with paper, so that the fingers will not be soiled in the use of this cue-tip material.

"I make use of chrome-green by preference on account of its peculiar roughness or silicious gritty character; but magnesia-green or ultra-marine-green may be used, and the mixture may be rendered of the proper color by the admixture of finely ground silica or other material, such as magnesia or chalk.

"This material or compound is to be in a finely-pulverized condition, and it is mixed with water and molded and pressed into the proper shapes, preferably cubical, and after being dried, or partially dried, the surfaces, all but one, are coated or covered with a protecting material—such as shellac, varnish, or paper—and the article is ready for use or sale. The cue is pressed upon or into this colored pigment in a manner similar to that employed when chalk is made use of."

Other Letters Patent introduced as anticipations were the following:

No. 85,018, dated December 15, 1868, to J. M. Merrick, for Improved Material for the Manufacture of Boxes, Picture Frames, Buttons, Insulators, Inkstands and other articles.

No. 201,283, dated March 12, 1878, to Charles C. Parsons, for an Improvement in Compositions for Crayons.

No. 269,722, dated December 26, 1882, to B. G. Seebach, for Composition for Cleaning and Polishing Metals.

No. 314,759, dated March 31, 1885, to Charles Walpuski, for Ink Erasing Compounds.

No. 329,349, dated October 27, 1885, to W. H. Wiggins, for Substitute for Billiard-Cue Chalk.

No. 450,560, dated April 14, 1891, to W. W. Dunnett, for Composition of Matter.

No. 552,269, dated December 31, 1895, to William L. Woods, for Plastic Composition and Process of Combining same.

No. 510,874, dated December 12, 1893, to Justin Duprey, for Composition for Producing Artificial Emery Wheels.

German Letters Patent No. 80,146, to Carl Koster, dated February 28, 1894, and issued February 19, 1895, for Composition for the Production of Imitation Marble Veneers.

No. 83,280, to William Grume, dated July 26, 1894, and issued October 10, 1895, for a Plastic Stereotype Mass.

No. 69,973, to C. L. Wurm, dated December 1, 1892, and issued August 30, 1893, for Tip for Billiard-Cues.

A substance known as Italian chalk, sometimes called in the record French chalk, was introduced in evidence. It seems to have been called to the attention of billiard experts at Paris some time previous to the taking out of appellant's patent. It proved to be superior to the common billiard-chalk. Spinks, who was a billiard expert, brought it to Hoskins' office, and requested him to make an analysis of it. In speaking of this analysis, Hoskins says:

A. "Mr. Spinks came to my office and showed me a piece of chalk, and requested me to make an analysis of it. This I did to the point as shown by my notes, a copy of which is a matter of record in this case. Then I asked Mr. Spinks to tell me the necessary qualities for the production of a perfect chalk, or chalk substitute for use in billiards, being myself unfamiliar with the game, telling him at the time, and in substance, that I did not think it at all probable that the French chalk could be duplicated, because the material was not at hand, and I did not know where it could be obtained, but that I

thought if I understood fully the requirements I could produce a preparation which would fill the requirements. I then, at his suggestion, made a number of experiments on pieces of chalk substitute, and Mr. Spinks took them, experimented with them, advised me as to their deficiencies, and I made further preparations and experiments, which finally resulted, after we had carried on these tests for some time, in selecting silica as giving altogether the best results. We then made further experiments, which resulted in the addition of small quantities of corundum to the silica, and finally we decided to color the material to give it a distinctive character.

Q. 64. "You say that the material of the piece of chalk given to you by Mr. Spinks was not at hand. Do you mean that you could not obtain the substances of which it was composed, as revealed by analysis?

A. "No, but I mean that it was evident, from facts obtained during my analysis, that the material was not a mere mechanical mixture of silica, alumina and water and other substances, but that it was essentially composed of a material which had resulted from a chemical union or combination of these substances, and that this material was probably a natural product, possibly found in the pulverulent state, but at any rate it was a product the result of the forces of nature, and one such as would be exceedingly improbable of reproduction artificially. At any rate I knew of no way to reproduce the substance, and suggested, therefore, that I could do as well or better if I knew the requirements by searching for some other material with the proper qualities."

And in answer to cross-examination he says:

X-Q. 73. "I understand from a reading of your testimony, that silica, in your opinion, possesses a peculiar abrasive or frictional quality as applied. Without that abrasive or frictional quality would your substitute be of any value for the purpose intended?

A. "Without the properties which make it abrasive or frictional it would not be efficient.

X-Q. 74. "Are the abrasive or frictional properties of silica varied or modified to any considerable extent by the admixture therewith of any or all of the other ingredients mentioned in your patent?

A. "Undoubtedly modified, depending upon the relative proportions and quantity of all the other constituents. .

X-Q. 75. "Neither the coloring agent nor the binding agent add to the frictional or abrasive quality of the silica, do they?

A. "They do not.

X-Q. 76. "And the corundum only adds to the frictional capacity of the silica, insofar as it roughens the cue-tip and enables it the better to take and hold the powdered material. Is this so?

A. "That is the purpose for which the corundum is added, but it should be explained that nothing can be taken away from or added to the frictional or abrasive properties of the silica by the mere addition of some other substance. The effect might be one of mere dilution and therefore detrimental, or it might add to the general result and efficiency, depending upon the nature of the addition."

The following analyses of the Italian chalk, made on behalf of appellant, were introduced:

"W. A. Spinks,
   Sample Billiard-Chalk.
      one gram. fused.
         Loss on ignition 20%

| | | |
|---|---:|---:|
| $SiO_2$ | 351 | 35.1 |
| $Al_2O_3$ | 418 | 41.8 |
| | | 76.9 |
| | | 20. |
| | | 96.9" |

B. 2.

| | |
|---|---|
| *Silica .................................................. ⎤ ........... none | |
| Ferric Oxide ......................................... | ........... 1.09 | |
| Alumina ...............................................: ⎬1........... 3.31 | |
| Carbonate of Lime ................................... | ........... .90 | |
| Carbonate of Magnesia .............................. ⎦ ........... trace | |
| *Silica (combined) ⎱ ............................... ⎤ ........... | |
| Silica (uncombined) ⎰ | ........... 33.00 | |
| Ferric Oxide—$Fe_2O_3$ ............................. | ........... trace | |
| Alumina—$Al_2O_3$ ................................... | ........... 19.40 | |
| Lime—$CaO$ .......................................... | ........... .50 | |
| Magnesia—$MgO$ ...................................... | ........... .09 | |
| Potash—$K_2O$ ....................................... ⎬2........... 6.04 | |
| Soda—$Na_2O$ ........................................ | ........... 3.08 | |
| Sulphate of Barium—$BaSO_4$ ........................ | ........... | |
| Loss at 100° C ...................................... | ........... 2.50 | |
| Loss on ignition .................................... | ........... 28.30 | |
| Less loss at 100° C ................................. | ........... | |
| Lead Chromate ....................................... | ........... none | |
| Prussian Blue ....................................... ⎦ ........... none | |

*1. Soluble in Hydrochloric Acid.
*2. Insoluble in Hydrochloric Acid.
B. 2. Blue chalk colored with Prussian Blue. (French.)

| | |
|---|---|
| Loss at 230° Fah. for one hour............................... 86% | |
| Loss on ignition ............................................28.12 | |
| Aluminum oxide ($Al_2O_3$) ..................................24.12 | |
| Ferric Oxide ($Fe_2O_3$) .................................... 3.6 | |
| Free silica, sand, etc. ..................................... 9.32 | |
| Combined silica .............................................14.08 | |
| Calcium oxide ($CaO$) ....................................... .61 | |
| Magnesium Oxide ($MgO$) ....................................trace | |
| Alkaline Oxides .............................................13.31 | |

The argument of the counsel for appellant resolves itself, in the end, to the following proposition: "The result of the efforts of Spinks and Hoskins to produce a substitute, not merely for white chalk, but also for the Italian chalk, was the selection and employment, for the first time in the mechanical arts, of silica, free and uncombined, in its natural or commercial condition, for use under circumstances requiring that it be compacted in blocks, that part of its body should be transferred by rubbing on another surface, and that while thus held to the receiving surface it should interpose a friction-producing agency to exercise its function during the impact of the cue-tip against an easily movable, perfectly smooth sphere."

Douglas Dyrenfath, for appellant.
C. C. Linthicum, for appellee.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

After the foregoing statement of the case, GROSSCUP, Circuit Judge, delivered the opinion of the court, as follows:

The Hoskins and Spinks patent can lay no claim to invention in the conception that there can be an artificial substitute for billiard-chalk, for that was the expressed object of both the Peple and Wiggins patents; nor in the conception of compacting into blocks or cakes the material used, whatever it may have been, for such molding and compressing was described in the Peple patent; nor in the conception of any treatment of the material used, either as to proportions or mode of intermixture, for there can not be found, either

in the claims, or the description, any mention of proportion, or mode of intermixture.

The patent must be sustained, if it be sustained at all, upon the claim that the inventors, for the first time, in the manufacture of artificial billiard-chalk, employed pulverized silica in its natural or commercial condition; and that any use, by another, of pulverized silica, in the composition of billiard-chalk, no matter what may be the proportions, or however mixed, makes such chalk an infringement. The claim, in short, is that the adaptability of pulverulent silica, in connection with binding or coloring matter, to the uses of artificial billiard-chalk, is a patentable discovery. Upon the maintenance of this claim the case seems to stand or fall.

Silica is said to be the commonest of materials. It is found almost universally in nature; in sand stone, free sand, rock quartz and clay. It has been used in many arts; in some of them expressly on account of its gritty quality. It is spoken of in the Peple patent as a desirable ingredient to be mixed with other ingredients in the making of artificial billiard-chalk. Its quality of grittiness seems to have been within common knowledge—so much so, that the adjectives "silicious" and "gritty" are almost synonymous words.

It may be conceded that common knowledge, of this general character, does not, alone, amount to anticipation of the adaptability of silica as a base for billiard-chalk. Silica might be known to be abrasive, but not to the degree, or in the way, that is suitable to this art. It may have needed further information—possibly in the nature of discovery—to select and utilize silica as the base of artificial billiard-chalk.

But, on examination of the whole art, we feel compelled to hold that the gist of such information was already at hand, both in the Peple patent, and in the Italian chalk. The object of Peple was to obtain a chalk that, by reason of its grittiness, would cause the billiard-cue to take hold of the ball, and, on account of its color, save the table from the appearance of chalk marks. His objective was twofold: a quality, that would answer the purpose of the billiard cue, and a color harmonizing with the green of the billiard table. He selected what he calls "chrome-green," and pointed out that, should the color be non-coincident with that of the billiard cloth—probably an over green—it might be harmonized by the admixture of finely ground silica. The evidence does not satisfactorily show what substance Peple had in mind, in the use of the word "chrome-green," but in his own words, whatever it was, it had a gritty and silicious quality, and must have readily intermixed with free silica; otherwise free silica would not have been designated as a material to modify the color. The patent does not point out silica as a base for the billiard-chalk, but, unmistakably, it so clearly suggests it, that the next step taken was not a long one.

The next step was the analysis of the Italian chalk by Hoskins, who was a chemist. It was made at the suggestion of Spinks, who had just returned from Paris, where the Italian chalk had been used by expert billiardists. Spinks, like the others, was enamored of it;

but it was rare and expensive, and on that account could not be brought into general use. It occurred to Spinks, however, that that need not stand in the way; for as artificial billiard chalk was already well known, might not the ingredient of this new Italian chalk be ascertained, and made the base for an artificial chalk.

Several analyses were made. Though these did not closely agree, the chalk was found, in each instance, to contain a large percentage of silica. One put the silica at thirty-five, another at thirty-three, and the last (the free silica) at nine per centum. In the first and second it is not clear whether the reference was to free silica, or to silica combined and uncombined, but, in any event, these analyses pointed out, both the presence of silica, and its function in the chalk; for in none of the ingredients, other than silica, is there a suggestion of the grittiness or abrasiveness desired.

It is no answer to say that the analysis previous to the taking out of the patent (the last analysis having been made after the patent was obtained) did not show silica in its free state, and that the presence of combined silica is not a suggestion of free silica as a base for the chalk. The analyses were not the only things known to Hoskins and Spinks. They had, constructively, the Peple patent. They had before them, therefore, within the meaning of the law, grittiness as a desideratum; as well as the knowledge that this quality was possessed by silica, and that there was no other ingredient in the Italian chalk possessing it. It took no invention, from premises so simple, to infer that the presence of silica in the Italian chalk was what gave to it its utility as a billiard-chalk.

It is true, that as far as we know, the Italian chalk had not yet been analyzed by others. But the analysis is what any chemist could have done, and the suggestion that it be analyzed, in view of all that had gone before, is not, in our opinion, an inventive act. It led to no new kind of article; for artificial billiard-chalk was old. It was not, in any just sense, an independent discovery in nature, subsequently utilized in one of the arts; for, in substance, it was nothing but a chemical search into a chalk already in the art, for the ingredients that gave to such chalk its excellence. It was research, but not patentable discovery.

We do not hold that Hoskins and Spinks have not discovered a new artificial chalk. No other chalk, artificial or natural, seems to run so high in silica. But if their chalk is, on that account, patentable, it is not because of the use of pulverized silica, in any proportion, but because of the particular proportions employed. Had the description and claims proceeded upon some designated treatment or process, we might have found a way to sustain their validity. But the patent is ambitious far beyond this. It seeks to exclude the use, by others, of pulverized silica in any proportion. It surveys a field that includes any silicate "having a frictional property and capable of being pulverized and compacted." To sustain this would be to hold that the use of pulverized silica in a billiard-chalk, independently of the proportions employed, was a discovery properly embodied in appellant's patent. This the state of the art will not justify.

The decree of the Circuit Court is, accordingly, affirmed.